Good morning, Your Honors. Claudia Van Wyk for Appellant Charles Rhines. I'm going to be focusing on point one of our brief this morning, and we've asked for 13 minutes for my time. My point deals with claims that were not raised in the state court. My colleague, Mr. Lev, will focus on point two. We've asked for 17 minutes for Mr. Lev, including rebuttal time if time remains. Mr. Lev will be focusing on ineffective assistance claims that were raised in state court. The same deficient investigation gives rise to both sets of claims, but point one reaches the court in a preliminary posture because an amendment to add the new claims was denied and also because the request for relief is limited. I'd like to focus on two errors of the district court. First, the court deviated from this court's precedents and those of other courts which treat specific claims of ineffective assistance as separate claims, specific instances, for the purposes of analyzing exhaustion, default, and eligibility for excuse under Martinez v. Ryan. And the second error I'd like to address is that the court didn't appreciate that even if it rejected counsel's conflict claim and pinholster arguments, it still had discretion to allow an amendment and needed to make a factual inquiry about the federal public defender's conflict of interest and conduct during the history of the case before deciding whether to give new counsel time to make a decision. So I think the most important question for this court is the difference between new claims and new evidence under the Supreme Court's precedents in Martinez and pinholster. Before you get to that, wouldn't these claims be barred by the South Dakota statute of limitations? I don't think so, Your Honor. It's not really clear whether there would still be an avenue of relief because while there's a new statute of limitations that came into effect in 2012, the court also has precedent that effective assistance of post-conviction counsel is required, has not addressed the relationship between that and the statute of limitations, nor has it decided any constitutional claims or any claims about special rules for capital cases. There's a case, Hugh Banks v. Dooley, that has decided that for somebody whose case predates the amendment, there's a two-year grace period which would have expired for Mr. Ryan in 2014. So in terms of statutory interpretation, it might be barred. Moreover, even if there's no remedy, Martinez v. Ryan excuses any default of the new claims. Well, it might excuse a default, but would it excuse a state statute of limitations? That would be the default that would be excused under Martinez v. Ryan. Martinez dealt with a state statute of limitations? No, it dealt with a claim that had never been raised before. That's what I thought. Yeah. A traditional default. Well, one of the procedural rules that is addressed, I think, in the procedural default doctrine is claims that are out of time. I think a number of the cases in our briefs involve cases that would otherwise have been out of time and courts asked lower courts to analyze in terms of Martinez whether the ineffectiveness of post-conviction counsel would excuse those defaults. And I just want to refer... Are there any cases where Martinez is used to get around a state statute of limitations? I can't think of one standing here, Your Honor. I know that courts have used Martinez in a variety of contexts. I'd like to also point the court to a key procedural fact. When the district court ordered a stay and abeyance in this case, it directed counsel specifically to address claims that had already been raised in the federal habeas petition. And those were the claims that were subject to the post-conviction litigation that took place after the stay and abeyance was granted. The new claims were not among those claims. And the court... Was there a limitation? Did the court put any limit on what types of claims could be brought? Yes. The court's order specifically states exhaust these claims and lists claims that had already been pled in the federal petition and which were exhausted. Well, of course it said that. What else would it have said? Well, the court could have said go back and exhaust... The federal court? Yes. You're arguing that the federal court precluded the attorneys in the state court from doing something that the state court might have allowed them to do? Well, I think that's something that needs to be explored, but the terms of the stay and abeyance... Not very long. The terms of the stay and abeyance were quite specific. And I should point out that the district court, in granting the stay and abeyance, assumed that all appropriate claims had been investigated and pled originally in the first federal habeas. And the second error is that the district court didn't inquire when an officer of the court, namely the federal public defender, in signed pleadings indicated that a full investigation had never been performed. But that was at the second round, however, right? That was the recent round. Yes. So the federal defender was not involved in the initial... The very first state post-conviction petition was appointed counsel. It was not the federal defender. So which state proceeding are you focusing on that allows you to take advantage of the Martinez ruling? Are you focused on the initial proceeding or the second round? Yes. Focused on the initial proceeding, and I think that's the operative default for Martinez purposes. The Supreme Court has never specifically addressed this situation where subsequent rounds are pursuant to a stay and abeyance granted in specific terms. And I should point out that the court decided in Davila v. Davis last year not to allow a Martinez excuse pertaining to a default on appeal, but Justice Thomas indicated the reason for that is that Martinez seeks to guarantee one round of review for a claim by at least one state or federal court. In Davila, such review had been conducted by the trial court. Here, no court has ever reviewed the new claims. How can we ignore the second round, however? I think that the district court, as I read the opinion, was of the view that there had been a full opportunity to raise the claims. Yes. And maybe the district court didn't say this, but if you take your theory to conclusion, would there ever be an end? I think there would be, Your Honor. First of all, the district court, I think, failed to treat these as new claims. The district court didn't even get to the point that Your Honor is hypothesizing. The district court decided this is new evidence in support of old claims. Pinholster precludes me from considering new evidence. End of story. I think the limiting principle is that this was not a situation where the petitioner was coming back to reopen a habeas case. It was a situation where the same habeas had been pending. The court had been assuming that all claims had been identified. And the district court also heard for the first time after 2015 that proper investigation had not been done, number one, and that the person who had been in charge of the purse strings, namely the federal public defender, had a personal relationship with the victim's parents. The court rejected that without further inquiry. So all we're suggesting at this point is that the district court should be directed to inquire into the factual allegations that were made in support of an opportunity to amend and find out why a proper investigation was never done and then exercise its discretion in deciding under Rule 15 whether an amendment would be appropriate to decide the new claims. To do as you request, we would have to conclude that they are new claims and not simply- Yes, Your Honor. So could you address that a little bit? Sure, Your Honor. Give me your best argument for why this isn't just additional evidence on the same ineffective assistance of counsel claims regarding mitigation. I think the two most instructive cases are the Dansby v. Hobbs case that's in our brief at 30 and Sasser v. Hobbs. Both of those cases went claim by claim looking at specific instances of alleged deficient performance or prejudice and treated each one separately for purposes of deciding Martinez. For example, in Dansby, there were two claims that were potentially eligible for a Martinez excuse, failure to investigate the petitioner's early life and failure to prepare a social history. And yet another claim, more generally asserting that the petitioner had failed to prepare for the penalty phase, was ruled to be exhausted and not eligible for a Martinez excuse. Similarly, in Sasser v. Hobbs, a claim pertaining to meaningful expert consultation was treated separately from a claim pertaining to timely expert consultation. And I think, you know, for the purposes of consistency with prior practice, the district court should have treated these as new claims similarly. And then there's a district court case, McLaughlin v. Steele, which is in our reply brief at page 6. A claim concerning a psychiatrist was treated as unexhausted for Martinez purposes, whereas a claim concerning a neuropsychologist was treated as exhausted. And that's the kind of approach I think the district court should have taken here. The district court should have gone instance by instance. These were new claims. They had never been pled before. They had never been addressed in any court. No one has ever analyzed or evaluated Mr. Rines for head injuries, neurotoxicity, or diseases of the brain. He's had visits from professionals who evaluated personality structure and learning disability, but no one has ever assessed him for head injury, brain injury, brain diseases, or brain toxicity. And that is a separate claim that has never been addressed, and the court should have addressed it. And you're saying it's a separate mitigation claim regarding the mitigation? Yes, Your Honor. Because there was a doctor that was hired for competency and mental health issues? Yes. That's correct. And I see I'm just about out of my time, and I'd like to sit down and allow my colleague to speak. Mr. Lev. Good morning, Your Honor. Stuart Lev. And let me first thank you for allowing us to split the argument today. We appreciate that. Let me pick right up with you, Judge Kelly, on the last question you asked, because I think that's an important question. I want to focus on the mental health mitigation aspects of the ineffective assistance of counsel claim. And the evaluation that counsel sought from Dr. Kennelly is a critical part of that. And I think you're right. When you say there were, if you look at the order appointing Dr. Kennelly to do the evaluation, that's at page 1599 of the appendix, there are three issues that Dr. Kennelly is told to evaluate on. Competency, the ability to know right from wrong, which is sanity, and whether he had a paired mental condition at the time of the offense. Nothing in the charge to Dr. Kennelly dealt with background information or mental health mitigation that would be less than a guilt-faced offense. So Dr. Kennelly's evaluation was not a mitigation evaluation, and counsel never asked for a mitigation evaluation. And this is important because this is not a case like you see in a lot of the other cases where ineffective assistance is rejected, where counsel had no indications of mental health problems. Because counsel had interviewed the sisters, and the sisters, as they testified to at the penalty phase, gave a history of Mr. Rines' childhood that was replete with indications of mental health problems. His failure in school at a very young age, his inability to focus and maintain attention, his inability to process information so that the information that he knew in his head he couldn't get out on writing, his social isolation, his inability to fit in. They told his parents that he had psychological problems and needed help. So counsel knew all this. He knew that there were indicators of significant mental health problems that Mr. Rines faced from very early on in childhood. And yet, in requesting an evaluation, a mental health evaluation, he didn't ask for an evaluation for purposes of mitigation, even though counsel knew that this was a very, very difficult guilt-faced case that was very, very likely to end up in penalty phase at a death sentencing hearing. Well, I think the lawyers themselves testify that they didn't, for lack of a better phrase, want to go there for concern about what else might be opened up that would cast their client in a worse light. And I think that the courts gave that some deference. And I think that was an unreasonable finding of fact for this reason. First of all, we have to separate out the presentation at trial from the investigation of mitigation. Why is it a finding of fact? Or a conclusion. I think we argue in our brief it's both an unreasonable finding of fact, that this was the reasons for the deficient investigation and preparation, and that it's an unreasonable conclusion of law under Strickland and Wiggins. I mean, a finding of fact would be that they were or were not being credible in claiming that this was their reason. I would suggest, and I hope I'm not nitpicking, that the finding of fact is that they had a strategic reason. Well, I mean, it matters so much to the standard review, obviously. Right. And to the subpart of D1. Of course. And I would think that the finding of fact is they had a strategic reason not to engage in a mental health evaluation for mitigation purposes. And there's certainly no testimony that they had that kind of strategic reason. The orders that the trial court issued that limited the presentation of evidence at the time of the penalty phase weren't issued. One was issued a few days before trial, and one was issued during the course of trial. Let's stick with that part of D1. What's the evidence in the record that suggests that the finding that they had a strategic reason was clearly erroneous or unreasonable? Well, the evidence is that the orders that limited the evidence to be presented at trial didn't come until months after the evaluation took place. So they couldn't have had a strategic reason based on the trial court's orders. Well, maybe it would have been in light of the fact that they had two doctors who had done evaluations that really didn't make any significant diagnoses. Well, I think that's – I would disagree with that respectfully, Judge Grunder, because Dr. Arbs, who did the psychological testing, had significant diagnoses. He found general anxiety disorder, schizotypal personality disorder, which is a severe mental disease and defect that interferes with people's functioning and their social relationships with people, that causes breaks from reality, that fits in consistently with the evidence they did present at trial. Okay, so even if you deem that to be significant, they knew about that, and yet why wasn't it reasonable to make the strategic call that they didn't want to open the door? But what they didn't do, and this is where I think they dropped the ball most significantly, is they didn't make sure that Dr. Kennelly, their psychiatrist, had that information from Dr. Arbs. Dr. Kennelly's report was written before Dr. Arbs' report. Dr. Kennelly, in his report, says, I see some indications of personality interactions and issues that I would like to explore. I want to see Dr. Arbs' report. And after Dr. Arbs issued his report that found significant mental health issues and cognitive processing issues, counsel never followed up with Dr. Kennelly to say, how does this report fit in and can we use it for mitigation purposes? And that's where the deficient performance falls in, that they had the experts, but they didn't give the experts the information they needed. They never gave Dr. Kennelly the background information that they had obtained from the sisters about all those red flags of mental health issues that he had in childhood. So when counsel doesn't provide the information to the doctor they're using for an evaluation, their performance is deficient and they haven't done the investigation necessary to make a reasoned strategic decision. And that's where you run into cases like Wiggins and Williams, where counsel went partway, had information that they had to follow up on and didn't follow up on, and so the strategic decisions they made weren't based on a complete investigation. And that's what differs this case from the Berger and Darden line of cases, where counsel didn't leave any loose ends on the table. They did the investigation that was available to them, and then after that investigation was complete they made strategic decisions. And had counsel here made strategic decisions after a complete investigation, they would be entitled to much more deference than they get when they make decisions without completing their investigation. Had any of the lawyers that represented Mr. Rines at trial tried a capital case before? No, none of them had any capital experience. They didn't obtain any capital training prior to the case. Two of the lawyers were civil practitioners who had very little criminal experience. The third lawyer, Mr. Stonefield, was a criminal lawyer. He was a public defender, but who was appointed originally as the investigator in the case. And all the lawyers testified that Mr. Stonefield made one investigative trip to Seattle to investigate the circumstances of the confession. When was the South Dakota capital state court prosecution immediately before Mr. Rines' case? I frankly don't know the answer to that question. I think your notion that they'd never tried a capital case means that constitutionally the South Dakota court was required to bring in a defense counsel from states that had capital prosecutions. South Dakota, I mean, when I came on the court 27 years ago, I knew that South Dakota had the death penalty and, quote, had never used it. So, big surprise, there wasn't any criminal defense lawyer in South Dakota who'd ever tried a capital case. There had been a couple of capital prosecutions before Mr. Rines. I just don't know the names or particularly which ones they were. And I'm not suggesting that there's a constitutional duty to provide capital lawyers with experience, but there is a duty on the lawyers if they're going into a capital case they've never done before to try to educate themselves, to take training, to educate themselves on what should be done. And where in the record do we find whether they did or didn't do that? Mr. Stonefield did testify that a few weeks before the start of trial in December, he got some information from an organization in Georgia that trained capital lawyers and that they got that information in writing and that they had it a few weeks. That was the limits of what was testified to at the time of the hearing. But that's not the basis for, it's not their status as non-experienced lawyers. It's the efforts they made or the lack of efforts they made along the way that rendered them deficient and that rendered the state court's decision an unreasonable application of Strickland and Wiggins and Williams, etc. Let me talk, if I may, briefly as to the prejudice prong of ineffective assistance of counsel. The district court found, and we agree with that, that the state court did not address prejudice. The district court did not address prejudice either. And so if you agree with me that counsel was deficient and that the state court was unreasonable, the appropriate remedy is to remand this to the district court, to allow the district court to make a de novo decision as to both deficient performance and penalty. But if you find, and the language in the state court opinion is admittedly somewhat vague as to which prongs they're talking about, that the state court reached a decision on prejudice, I would suggest that that decision was likewise objectively unreasonable under D1 and D2. And for this reason, the district court said that there was nothing in the psychological reports, in Dr. Ertz's report, that was useful to the defense. And that, I believe, is just wrong. And it's wrong for this reason. My apologies. And it's wrong for this reason, because besides the usual ineffectiveness prejudice about how does this fit in within the overall mitigation posture of the case, there's something unique about Dr. Ertz's report in this case. And that is Dr. Ertz comments on Mr. Rines' demeanor during the confession. Now, Mr. Rines' demeanor during the confession was a major issue in the penalty phase part of this case. The prosecution characterized him as cold and callous and remorseless. They played the tape to the jury, and they talked about how he came off to the jury. The South Dakota Supreme Court on direct appeal even mentioned that. And it's mentioned in my adversary's brief to this court. Dr. Ertz would have testified that what seems to be cold and callous is really a product of his mental health deficiencies, that his ability to process information as he's being questioned in a highly stressful area, to read social cues, to relate to people, how he responds because of his mental health difficulties, is a better explanation for his demeanor than coldness and callousness. And so for prejudice, all we need to show is that there's one juror who there's a reasonable probability that one or more jurors might have reached a different result. If a jury finds that his demeanor at the confession is not the sign of callousness and evilness, but is a sign of mental health problems and a childhood history of mental health and social interaction and social communication problems. In a case like this, where the death penalty question was close, the jury deliberated for more than eight hours, asking questions about the nature of life imprisonment. The South Dakota Supreme Court, two justices found that on the facts of this case, the death penalty was disproportionate. It was a three to two decision. Those two justices were the minority, but it shows the closeness of the case. So for that reason, there would be prejudice and certainly should go back. I would like to, if the court has no further questions on this or the other issues, reserve my remaining time for rebuttal. Thank you. Thank you. Mr. Swedlund? Thank you. May it please the court and counsel. This 25-year-old case boils down to a single question. Are the state Supreme Court, state habeas court, and district court decisions denying Ryan's relief on his subject claims contrary to or an unreasonable application of United States Supreme Court law? Ryan's essential claim here is that his trial counsel conducted ineffective mitigation investigation. But as described in the testimony and affidavits of Ryan's defense counsel and as pointed out by Judge Kelly, his defense counsel felt that they were, quote, walking a pretty fine line on the mitigation that they could present so that they would not open the door to Ryan's alarming criminal and personal history. But you don't open the door until you present it. And so if you investigate it and you don't like what you find, you don't present it as your evidence. So how is the I don't want to open the door reasoning applicable to just simply finding out what's out there to begin with? And Ryan's trial counsel did do a customary mitigation investigation, starting with their client. And that was where the problems immediately started to arise in the form of Mr. Ryan's autobiography. Mr. Ryan's described a history of his life that showed that friends that he had had were, by and large, criminal accomplices or victims. They showed that the basis for many of the arguments being made here today, that he performed poorly in school due to mental defects or anything of that nature, was unfounded. Can I ask how this autobiography, how did this come about? How did that become an exhibit or evidence in these proceedings? His counsel had him prepare it as part of the mitigation case. And presented that as evidence? No, it wasn't presented as evidence. It was given to his counsel. And then his counsel uses that to base the decision on how to structure the mitigation investigation. So this just came out in the determination of the effectiveness of counsel. Correct. This was not something that was turned over during the course of. No, and it would not have been. It was at the state post-conviction proceeding? State post-conviction. First one. Yes. But that autobiography certainly informed Ryan's trial counsel as to what they were facing in terms of trying to build a mitigation case. Not only that, Ryan's trial counsel could justifiably assume that if it was in the autobiography, the state was going to find out about it. And the same information in one form or another that was in the autobiography was going to make its way into the counter mitigation case if they opened the door to it. Is it a fair assessment to say that the admission, the statement, confession on the part of Mr. Ryan's was a significant part of the state's case? Certainly. In both guilt and penalty? Certainly as to the guilt phase, and I think the record is pretty clear that the jurors in the penalty phase were quite taken with the fact that Mr. Ryan's demeanor during that confession was very cold-blooded and calculated. Wouldn't that in and of itself suggest that counsel should dig in deeper to, once you've got that, it wasn't likely that it was going to be suppressed. Wouldn't it make sense to try to figure out something to at least mitigate that, that presentation of the client to the jury? And they did. They had him evaluated by Dr. Connelly. They had him evaluated by Dr. Arbus. They looked for anything. They were instructed, tell us anything that we can use. Do you think there was a distinction between whether Dr. Connelly was used for the guilt phase versus the penalty phase, given the, I guess, directive from the paperwork? Well, Dr. Connelly wasn't used at all at trial because they… Okay, I'm sorry. Let me back up. Then for the guilt phase versus penalty phase? Or any phase of trial. I think once they opened the door to Ryans' mental status, whether it's during the guilt or penalty phases, they opened the door to everything. So that was the strategic calculus that trial counsel made that they wanted to avoid at all costs, opening the door to Ryans' background any further. And they had him evaluated, and that evaluation did look, despite what opposing counsel says, it did look for neurological problems. They screened Ryans for neurological deficits, and Dr. Connelly simply found none. There's no reason at that point in time, and there's no United States Supreme Court case that says, well, once you've had him neurologically screened once, you have to have him go neurologically screened twice. So that's really what we're kind of talking about here. They did what they were supposed to do. They had him evaluated. They turned him over to Dr. Connelly, Dr. Arbus, a third doctor even, and they came up empty-handed with anything significant. Would we be in a different situation if the motions in Lemonet had been denied and just the state court had allowed in the evidence that Mr. Ryans was trying to keep out? And so then there is this damaging evidence coming in, and we all know that two weeks or a week before trial. Would we be looking at this case differently? Well, possibly if the prosecutor took the bait and put all this damaging evidence in. Did the prosecutor object to the motion in Lemonet? It wasn't a conceded motion? No, certainly they fought that, and they lost. So they were trying to get it in? Yes, they wanted to get as much aggravating evidence in as they could. But the trial court said, no, the only thing you can talk about are statutory aggravators. That's it. Any other aggravating evidence that does not pertain directly to a statutory aggravator for eligibility purposes, that just doesn't come in, which is a rather extraordinary ruling, and I don't think that that's a ruling that would probably be made today, but that's what the trial court did. So that was a rather monumental ruling. But in spite of that, whether that ruling, whether they won that or not, Ryans' trial counsel still had to decide how much are we going to try and open this door or how much are we going to try and keep the door shut. And that was, at bottom, what his trial counsel aimed to do and succeeded in doing. You're not conceding then in the absence of the win on the motions in Lemonet or the decisions in the motion in Lemonet that the counsel would have been defective, are you? I'm sorry, I don't understand the question, Your Honor. Had the motion in Lemonet gone the other way, you're not conceding that the investigation that they did was deficient? No, not at all. It was not deficient. I'd say it was a fairly textbook mitigation investigation. They talked to friends. They talked to family. They looked at his Army records, incarceration records, social history, psychiatric testing. And remember, this is 1992. This is before this whole cottage industry of mitigation that has developed in the last 25 years existed. We have to look at the standards that existed at the time. And when we look at that, we're looking at Strickland. We're looking at Darden and Berger. And in this case, as in Strickland and Darden and Berger, the strategic imperative of keeping all this damaging litany of mitigating evidence out is what ruled his trial counsel's decisions, and that decision is in and of itself beyond challenge in habeas corpus. And even assuming that Rines' allegedly overlooked afflictions were genuine, the fact remains that they were not mitigating evidence of sufficient quality to warrant opening the door. And Rines fails to demonstrate how the state habeas corpus court or the district court decisions that this strategic calculus was not ineffective is contrary to or an unreasonable application of Pinholster or Strickland, Berger, Darden, Williams, Wiggins, Rompia, Wong v. Belmont, or Bobby v. Vanhook. Rines. Has the Supreme Court addressed the significance of before and after case law in this kind of issue? Yes, it has. We're not allowed to look at counsel's entire brief based on Rompilla and other post-trial cases that can't be considered? You can look at the brief, but the standard that applies in terms of the effectiveness of counsel in 1992 is the standard that existed in 1992, and Strickland, being a 1989 case, really is the one that defines that standard. And Strickland is very much like this case. In Strickland, just as here, the decision was to try and keep the defendant's history of having spent most of his life in jail out of the record. And that, by comparison, like Mr. Rines himself, also spent the most of his life in jail. But on top of that, there was an amount of other aggravating evidence that didn't even exist in the Strickland case. But simply the calculus of trying to keep his criminal record out was sufficient in Strickland to warrant counsel's investigation in that case. So really, it's Strickland that is the operative standard here. And I'm sorry, Judge Loken, I can't give you the specific Supreme Court site, but, yes, the United States Supreme Court has said that you look to the standards that existed at the time. Rines then sought to amend his petition to allow his second habeas corpus counsel. Well, you're, in effect, arguing that decisions like Wiggins are not given retroactive effect, and that's never been my understanding. So I didn't see this brief, particularly. I was reading these briefs pretty fast. Those cases are examples, again, of how the mitigation standards and the level of mitigation required or not required is a fact-sensitive question. And so in the Williams-Wiggins. The standards evolve, but what case says you can't apply today's standards in looking at the mitigation analysis that was done in 1992? And I don't have that specific site in front of me, but that is United States Supreme Court law, and I can supplement with the clerk a citation with that after the argument if the court wishes. Did you address the Stonefield affidavit where he said the defense team didn't develop an adequate plan of investigation and mitigation? Well, I'm not sure that that's quite what Mr. Stonefield said in his affidavit. But, yes, we have the affidavit also from Mr. Gilbertson. Mr. Gilbertson says that they did certain things that either Mr. Stonefield doesn't remember or wasn't involved in, the left hand not knowing what the right hand is doing. You have three different lawyers, which I might add were very experienced lawyers. Joe Butler is one of the most revered lawyers in South Dakota history, even though he was a civil lawyer. Mr. Gilbertson is a very fine and very gentlemanly lawyer. Mr. Stonefield is a very experienced lawyer. So the notion that these guys were the three stooges coming in there, that's not correct and it's not fair to these lawyers. But Mr. Gilbertson said, these are the things we did. And Mr. Stonefield maybe doesn't remember or maybe said he didn't do that. He can only speak for himself, not what Mr. Gilbertson did. But even considering, if you want to look at, well, they aren't exactly saying the same thing, that doesn't change the fact that the very damaging nature of the aggravating evidence that existed in this case was something that had to be kept out of Mr. Rines' penalty phase of this case, really pretty much at all costs. Rines then sought to amend his petition in the federal habeas corpus court below to allow his second habeas corpus counsel an opportunity to conduct more testing and introduce more evidence of these insubstantial alleged mental afflictions. And this was pinholster all over again. Why aren't these separate claims, if we can start there? Why aren't they separate identifiable claims of ineffective assistance at mitigation? Well, the claim is ineffective assistance, ineffective mitigation investigation. So your view is that's just one big general claim? That is an umbrella claim, and then I'm not aware of any United States Supreme Court case that dissects that claim into different facets and says failure to talk to the first grade teacher is a different claim from failure to talk to the second grade teacher. Well, let's not go that detailed. Let's rise up a little bit. I don't think that's what he's trying to do, the second versus first grade teacher. Close. Is there a Supreme Court case that says that you do do an umbrella in ineffective assistance? Off the top of my head, I don't know if there's an explicit holding to that effect, Your Honor, but I do know that the Supreme Court has looked at ineffective assistance claims as that claim. So in terms of meeting the burden here of showing that Judge Schreier's ruling that this is all one claim and simply new evidence in furtherance of that claim is contrary to or unreasonable application of any United States Supreme Court law. Well, if I can just push you a little bit, if we do just traditional ineffective assistance on a guilt phase, you don't just say you were ineffective at trial, generally umbrella. There's always individual claims, and there's all sorts of case law on whether a claim relates back and is it a separate claim, different stages of the trial, and different decisions by the lawyer. Why doesn't that apply in the mitigation as well? Well, if the claim relates back, then it's the same claim. And that's the problem they have is that they want to say, well, this is a new claim, but it isn't a new claim. So consequently, the district court was correct in saying no, you had an opportunity to go back and look at mental issues. You went back to state court. You had a doctor, Dr. Dewey Ertz, come in, and he testified live in trial during the state habeas corpus proceeding. I take that back. That was a different witness in a different part of the proceeding. At any rate, Mr. Ertz's report was taken into evidence. They had an opportunity to examine him. And like Drs. Connelly and Arbus before him, Dr. Ertz came up basically empty-handed. He hypothesized, and he merely hypothesized, about this cognitive processing deficit. So that has been covered in terms of whether there was anything there that caused him to sound evil during the confession. And Dr. Ertz came up with nothing. There was no formal diagnosis at all. He had the opportunity to do the testing. He had full access to Rhines, and he came up empty-handed on that. If there had been something there to pursue, I think that Dr. Ertz would have done that. So, Your Honor is correct in terms of are we parsing this down to first and second-degree teachers. No, but the fact remains is that his mental health status, both at the time of the second state habeas corpus as well as anything that existed at the time of the murder, that was examined by Dr. Ertz. And when Judge Schreier remanded this case to state court, after this case went all the way to the United States Supreme Court and back down, created the stay-in-abeyance rules that go by Mr. Rhines' name to this day, when she remanded at that point, she told second state habeas counsel, you bring every claim you've got. Anything that you think is a viable claim, you need to bring it. If not, it's going to be waived, and that's in the order that's referenced in the briefing and in the record. So they were told to bring any claim they had, and this claim that comes up later about airborne toxins, groundwater contamination, this all falls under the umbrella of the claims that they were ordered to bring. Consequently, Judge Schreier found that Mr. Rhines was not raising an unexhausted claim. He was raising unexhausted evidence. And even if Mr. Rhines is afflicted with ADHD or some sort of cognitive processing deficit or PTSD, these afflictions ultimately are immaterial, because they pale in comparison to the counter mitigation evidence that the state had available to it. The United States Supreme Court in Pinholster found, quote, there was no reasonable probability that the additional evidence Pinholster presented in his state habeas proceedings would have changed the jury's verdict, because it would have opened the door to damaging rebuttal by the state's expert. And Pinholster's proffered mitigation was stronger than Rhines' and the aggravating evidence in Rhines' was much stronger than in Pinholster. Thus, Rhines has failed to demonstrate how his inability to amend his complaint was an abuse of the district court's discretion or would be contrary to or an unreasonable application of Pinholster or Martinez. Unless the court has any further questions about these claims, I understand counsel is limiting basically their argument to claims one and two. I don't want to talk about any further claims unless the court wants me to or has questions about them or has questions about claims one and two. Thank you, Your Honors. Thank you. Let me make two quick points as to claim one, the unexhausted claims. One is the standards of 2254D that require clearly established federal law don't apply to this question. The question of whether these are new claims or new evidence supporting a separate claim is a question of law. It's not an adjudication of the merits by the state court. So it's a question of law. This court reviews it de novo. 2254D doesn't apply. The question of whether counsel was told to go back and exhaust all claims or whether the orders limited the claims, we read the orders as limiting the claims to go back. Those orders can be found on appendix at page 1063 and 1082, and I'm sure this court will make its own judgment on that. As to the ineffective assistance claim that is preserved, let me say this. One of the problems here is that neither the state court at the second habeas or the district court below held a hearing to resolve some of the disputes between Mr. Stonefield. I have to ask you before we're done here, why are the post-trial cases on which you so heavily rely, the governing standard for whether there was a deficient performance in 1992? When I came out of law school and clerk, it was still constitutional to have an integrated guilt and penalty phases so that deficient performance in those days couldn't conceivably have involved what you're talking about here. No lawyer in their right mind would open up at the guilt phase this kind of mitigating penalty. So why isn't counsel right that we're looking at Strickland and Darden as the standards for judging deficient performance at the time of the trial? Well, Strickland is the standard, and that's what the Supreme Court said in Williams and Wiggins and Rompilla that those cases were simply applications of Strickland. My time is up. May I answer your question, Your Honor? Yes, please. Give me a case. Let me give you a point. Rompilla was a case that was tried in the late 1980s, and they applied Strickland to Rompilla. Williams and Wiggins were cases that were tried around the same time as Mr. Rines' case in the late 80s or the early 90s, and they applied Strickland to those cases. So the Supreme Court, and I think the dissent in Williams, if you look at the dissent in Williams, it says that you're creating new law, and the majority rejected that. I think that's Williams. Maybe it's Wiggins. I'm not sure. But that's my answer to that question. Thank the Court very much for its time today. Much appreciated. Thank you, counsel. The case has been thoroughly briefed and well argued. It's obviously important. We'll take it under advisement.